FRANKLIN LIFE INSURANCE COM-
PANY et al., Appellants,

v.

John McLain FAGGARD, Appellee.

No. 12964.

Court of Civil Appeals of Texas.

San Antonio.

Oct. 24, 1956.

Rehearing Denied Nov. 21, 1956.

Lang, Byrd, Cross & Ladon, Baskin, Casseb & Casseb, John M. Gilliland, San Antonio, for appellants.

Biery & Biery, Harvey L. Hardy, San Antonio, for appellee.

NORVELL, Justice.

Appellee, Dr. John McLain Faggard, secured a judgment in the district court cancelling four life insurance policies issued to him by appellant Franklin Life Insurance Company, and directing the return of $1,850 paid as premiums. Three of the policies were for $10,000 each and one, for $5,000, making a total of $35,000. The basis of the judgment was a jury's finding that agents of the insurance company had represented to Faggard that the policies involved "would realize a net return of at least fifteen per cent per annum on all sums paid to the Company as premium payments." Appellants, Franklin Life Insurance Company and its agent, Charles J. Rogers, contend here that the judgment should be reversed because the trial court should have given a peremptory instruction in their favor. The basis of appellants' contention is that the appellee had waived his right to rescind the insurance contracts involved. After a consideration of the record, we are of the opinion that appellants' points are well taken and should be sustained.

In any case wherein rescission is sought because of alleged fraudulent representations, the respective and relative positions of the parties are of paramount importance. As indicated by counsel in argument before the trial court, there is a substantial distinction between the case wherein a person claiming to be defrauded is "poor, ignorant, illiterate, unable to read, unable to understand common and accepted terms" and one wherein the claimant "is a person of marked business acumen and accustomed to handling substantial sums of money."

In this case, it appears that Rogers, the soliciting agent of the life insurance company, was an experienced salesman and seventy years of age. In 1952, at the time of the transactions complained of, the appellee was thirty-six years of age, and held Bachelor of Science and Master of Science degrees from North Texas State College, and an M. D. degree from Southwestern Medical School in Dallas. In 1947 he commenced the practice of medicine in Poteet, Texas, and shortly thereafter purchased the Schotts Memorial Hospital from

a Dr. Love, for $25,000, and has operated the hospital continuously since that time. In 1948, he took out a twenty-year-pay life insurance policy with the Federal Reserve Life Insurance Company, and thereafter secured a number of other insurance policies, aggregating more than $100,000. It was also shown that he had invested money in insurance and small loan companies. From the answers given by appellee upon his cross-examination, it appears that he was not only a successful medical practitioner, but also experienced in the purchase of life insurance policies as well as other forms of business contracts and investments.

As to the transaction of April 2, 1952, of which he primarily complains, Dr. Faggard testified as follows:

"He (Rogers) told me that I would realize on my money that I put in the (insurance and investment) program, if I left the money in the company at the time it would mature out it would realize me a net profit of 15, around 15% per annum, if I left it in the total length of time."

He also testified that he was told that it would take thirteen to fifteen years for this investment to yield the fifteen per cent per annum profit and that this representation as to high return induced him to buy the insurance policies. According to appellants, the representation as to the fifteen per cent return was not placed upon a per annum basis, but extended over the approximate premium paying span of the contract, that is, instead of fifteen per cent per annum, the contracts would pay fifteen per cent on the amount of premium deposits over a period of fifteen to twenty years. This conflict in testimony was resolved in favor of appellee.

The policies sold to Dr. Faggard were essentially twenty-year-pay contracts, with certain special features and numerous options as to mode of payment in the event of the death of insured or upon maturity

of the policy. It is, however, readily apparent upon an inspection of the face of the contracts that they are essentially life insurance policies, although coupled with certain investment features. The particular type of policy sold to Dr. Faggard was denominated, "President's Protective Investment Plan," and so marked in italics at the bottom of the first page and on the back cover. Insofar as the investment features of the plan were concerned, each $10,000 policy contained nineteen coupons, ranging in value from $60 for Coupon No. 1, due at the time the second annual premium was payable, to $103.80 for Coupon No. 19, due at the time the 20th annual premium was payable. The $5,000 policy contained coupons for one-half of such amounts. In addition to the promised payments represented by these coupons, the policies provided that the company would pay certain annual dividends, it being stated that "at the end of the second and each succeeding policy year, the Policy, while in full force or while being continued as Paid Up Life or Endowment insurance under the Non-Forfeiture Provision, shall be credited with such share of the divisible surplus from the participating business as determined and apportioned by the Company." A number of options were provided for the application of these dividend payments, such as payment in cash, application toward payment of premiums or investment with the company to accumulate as an interest bearing savings fund at a guaranteed interest return of not less than 3% per annum compounded on an annual basis.

There seems to be no contention that the company would not be able to meet its contractual obligations represented by the coupons attached to the policy, so that the falsity of the represented fifteen per cent per annum return is directly referable to the future earnings of the company. There was some evidence that neither the 1952 rate of income nor that enjoyed at the time of the trial was sufficient to pay a fifteen per cent per annum income upon the amount

of premiums paid. There was also testimony that experienced insurance men had told Dr. Faggard that these policies would not pay a return of fifteen per cent per annum, and it seems to have been assumed upon the trial that a fifteen per cent annual return was somewhat fantastic. In fact, Dr. Faggard testified that he knew of no investment that would yield such return, but thought he was getting one from the Franklin Life Insurance Company.

Dr. Faggard testified that after the policies had been delivered to him, he read them over, but did not understand them. Some time after he had contracted for the policies, he evidently became uneasy about his investment, for he requested a Mr. Thorengren, agent of the Bankers Life Insurance Company, and a Mr. Benham, agent of the New York Life Insurance Company, to examine the Franklin policies. He was told that while the issuing company was a reputable one and the policies were good, they would not pay anything like fifteen per cent per annum upon the policy investment.

Thereafter, on September 19, 1952, Dr. Faggard sought and received a conference with Mr. Rogers and Mr. Al Warner, the district representative of the Franklin Life Insurance Company. Warner testified that he explained the terms of the policies to Dr. Faggard, including the coupon provisions and those providing for the distribution of surplus earnings to policyholders. He positively denied that he made a representation of a return of fifteen per cent per annum, but contended that the policies would return fifteen per cent or better upon the premiums paid over the premium paying period of the policies. However, the jury found that Warner upon this occasion represented that Faggard "would realize a return of at least 15% per annum upon all premium payments made on the policies in question." This was in line with appellee's testimony, so we take it that Dr. Faggard, according to the jury, was again defrauded by use of the same representation. Whereupon appellee told Warner

that he would keep the policies and delivered them to Warner, with the request that a waiver of premium clause be placed in the policies by the company.

Three days later, however, Dr. Faggard arrived at the conclusion that the policies as written would do well to pay him a maximum of five per cent per annum and accordingly called Warner by telephone and demanded a return of the premiums paid and cancellation of the policies. Various negotiations then ensued between Faggard and representatives of the insurance company, which need not here be mentioned. We find no evidence that a duly authorized representative of the company ever agreed to a cancellation of the policies. It is true that the company has apparently retained possession of the policies which were delivered to its agent for the purpose of attaching waiver of premium clauses. This does not, however, operate as an estoppel against the company, nor as an acquiescence in appellee's demand for cancellation. Appellee's case is essentially one based upon fraud and deceit by means of false representations.

As above pointed out, the return upon the premium investment relates directly to the divisible surplus which must be provided from the commercial operations or earnings of the appellant insurance company. The representation relied upon is therefore one relating to the future income or earnings of a business. The general rule, as stated in Corpus Juris Secundum, is that, "The other elements of fraud being present, relief may be had for misrepresentations as to past or present rents, profits, or income; but misrepresentations as to future income and profits are usually held non actionable expressions of opinion." 37 C.J.S., Fraud, § 54, page 320. This rule is not without its exceptions and, "the question of whether false representations as to earnings and profits are actionable depends largely upon the circumstances of each case." 20A Tex.Jur. (rev.) 70, Fraud and Deceit, § 33. A material factor is

the relative position of the parties as to knowledge of the business or the availability of information. Tips v. Barneburg, Tex.Civ.App., 276 S.W. 932.

We need not decide whether or not the representation of April 2, 1952 (which, according to the jury's verdict, was made by Rogers), was actionable, for if on September 19, 1952, Dr. Faggard decided to keep the policies he would have waived any complaint of prior existing fraud, unless there was some circumstance which would prevent his acceptance of the policies from operating as a ratification of the contracts. Braxton v. Haney, Tex. Civ.App., 82 S.W.2d 984, wr. ref.; Santa Ana Citrus Groves, Inc., v. First National Bank of Chicago, Tex.Civ.App., 49 S.W. 2d 310, wr. ref. The circumstance relied upon by appellee was the repetition of the fifteen per cent per annum return made by Warner, according to the jury's finding. Assuming this representation to have been made, the question of whether Faggard was entitled to rely upon it still remains to be answered, and must be determined as of September 19th, when the situation was substantially different from that which existed on April 2nd. After the last date mentioned, the policies were delivered to Dr. Faggard. He was an educated man and testified that he read them over. His statement that he could not understand them cannot excuse him from being charged with knowledge of their contents. Indemnity Insurance Company of North America v. W. L. Macatee & Sons, 129 Tex. 166, 101 S.W.2d 553. The provision applicable to apportionment of the surplus funds of the insurance company among its policyholders, is not particularly difficult to understand. Dr. Faggard knew or was charged with knowing that the returns which he could expect from annual dividends were dependent upon the company's earnings in the future. In addition to this,

he had sought and secured the advice of insurance experts, who told him that the Franklin policies would not pay fifteen per cent per annum upon the premium deposits. Despite this information, appellee argues that he was entitled to rely upon Warner's representation of September 19th (as found by the jury) and thus avoid the legal effect of his acceptance of the policies on that date. Equity aids those who are vigilant in the assertion of their rights, but does not stand at the beck and call of those who merely change their minds as to the wisdom of completed business transactions. Considering the state of knowledge and information possessed by Faggard on September 19, 1952, it must be held that any possible exception to the general rule based upon a disparity of knowledge or information of the respective parties no longer applied, but that the situation was and is controlled by the general rule that fraud may not be "predicated on representations or statements which involve mere matters of futurity or things to be done or performed in the future." 23 Am.Jur. 794, Fraud and Deceit, §§ 35, 36. In our opinion, one who ratifies a contract is not excused from the effects or legal consequences of such ratification because in so doing he relied upon a representation or statement upon which he had no legal right to rely. A representation to avoid ratification must be one which would constitute a basis of actionable fraud.

In view of our holding that the trial court erred in failing to give an instructed verdict, it is unnecessary to pass upon other matters discussed in the briefs. It becomes our duty to render such judgment as the trial court should have rendered. Rule 434, Texas Rules of Civil Procedure. Accordingly, the judgment of the district court is reversed and judgment here rendered that appellee take nothing.

Reversed and rendered.